IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

| | |
|---|---|
| ROBERT ANDREW SHARP, JR.<br>Plaintiff,<br><br>v.<br><br>THE BOWLING GREEN KENTUCKY POLICE DEPARTMENT, and STEPHEN IRWIN, in his official and individual capacities, and JOSHUA HUGHES, in his official and individual capacities<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FILED
JAMES J. VILT, JR. - CLERK
DEC 2 1 2023
U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

Case: 1:23CV-174-GNS

## COMPLAINT

Plaintiff Robert Sharp, for his cause of action against the Defendants, states as follows:

### PARTIES

1. Plaintiff Robert Andrew Sharp, Jr. is a citizen and resident of Bowling Green, Kentucky. He is a former police officer who resigned from the City of Millersville, Tennessee and is duly licensed as a private, armed security guard by the Tennessee Department of Commerce and Insurance. In addition, Plaintiff was campaigning for the office of First District Constable in Bowling Green, Kentucky at the time of the violation of his rights alleged herein. .

2. The Defendants are the Bowling Green Kentucky Police Department, and its officers, Stephen Irwin an Joshua Hughes.

3. The acts or omissions alleged of herein occurred in Bowling Green, Kentucky.

## JURISDICTION AND VENUE

4. This is a civil action for damages and declaratory and injunctive relief for violations of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, brought pursuant to 42 U.S.C. § 1983, and a federal question is therefore presented under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). The Plaintiff's related state-law claims are within the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims in the original action that they are a part of the same case or controversy under Article III of the Constitution of the United States.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all of the Defendants reside in or are organized within this district, and the events, errors, or omissions complained of all occurred within the this district. Each defendant may be served in this district.

## ALLEGATIONS OF FACT

6. Plaintiff Robert Sharp is a former police officer with the City of Millersville, Tennessee. Beginning in August of 2021, Sharp was a Reserve Officer for Millersville Police Department. He then became a full-time, sworn police officer on or about September 30, 2021.

7. Sharp previously worked for the Cannon County Sheriff's Department in 2007 in their jail. He was certified by the Tennessee State Correctional Institute as a certified detention deputy. He was also a member of the United States Air Force, with an occupation designation of "security forces/police" until he was honorably discharged. Sharp also worked in Kentucky as a deputy constable in District Six and has completed numerous

    law enforcement certifications over the years, including training through the FBI academy.

8. Mr. Sharp is also a duly licensed private, armed security guard through the Tennessee Department of Commerce and Insurance.

9. In the fall of 2022, Plaintiff had been campaigning for the position of First District Constable in Bowling Green, Kentucky for the 2022 election and was unopposed until members of the City of Bowling Green Kentucky Police Department took action to falsely accuse and arrest him of impersonating a police officer and retaliate against him in violation of his constitutionally protected rights.

**Events in Kentucky Leading to False Allegations of Impersonating a Peace Officer.**

10. Robert Sharp's step-father was the Chief of Police of Bowling Green, Kentucky for some time. Because he had filed a lawsuit against the City, the BGPD had a vendetta against Sharp. Mr. Sharp had previously submitted an application to the BGPD, but found out that his application had been intentionally pulled out and eliminated from consideration. He was informed that the reason he would not be considered was "because of who you are related to." Although Sharp was aware that the BGPD held a grudge against him, he never thought that the BGPD would conspire to bring false charges against him.

11. On March 26, 2022, a neighbor came to Mr. Sharp's residence and informed him and Sharp's wife that she had been the victim of domestic violence. Mr. Sharp called Sgt. Mark Keiser of the Bowling Green Police Department, whom he had known personally since 2014, to inform him of the incident. BGPD dispatched two units to Sharp's address, and he spoke with the officers.

12. Both BGPD officers entered Mr. Sharp's residence, where the victim was waiting. Sharp informed them that he was a former police officer in Tennessee and Sharp introduced the officers to his neighbor, the victim of the domestic violence who sought refuge at his residence.

13. One BGPD officer, Stephen Irwin, apparently assumed that Sharp had worked for the Metro Nashville Police Department, which he would later list in a police report without Sharp's knowledge. At no point did Mr. Sharp ever state that he had worked for Metro Nashville Police Department.

14. At one point, the BGPD officers asked to have a minute alone with the victim, and Mr. Sharp and his wife stepped outside as requested. The officers completed their report and left Sharp's residence.

**Robert Sharp's Campaign for First District Constable in Warren County, Kentucky.**

15. When Robert Sharp first started his campaign for First District Constable, he received a dire warning from an active constable in another district: "If you run for Constable, the BGPD will set you up and ruin you." That warning would soon come true.

16. On September 28, 2022, Mr. Sharp was working traffic control in Nashville, Tennessee. His traffic control uniform consists of black uniform pants, a black shirt, and a yellow traffic vest. As a former police officer with a Private Protective Service License, Sharp was authorized to conduct traffic control as a private duty security officer on Tennessee roads.

17. When Mr. Sharp concluded his shift, he returned to his home in Kentucky. At approximately 3:30 pm, Mr. Sharp had arrived at the street where his residence is located. Because he is campaigning for District One Constable, Sharp has made an effort to reach out to potential voters. He kept campaign posters and fliers in his vehicle to hand out, and was looking to see if any of his neighbors were outside so he could speak with them.

18. Mr. Sharp noticed two girls from his neighborhood walking down the left side of the road as he drove on his street. Because Halloween was approaching, he had also stocked some candy in his car to hand out to children or anybody that cared for some.

19. The two girls were familiar to Sharp, whom he recognized and had seen walking in his neighborhood before. He stopped his vehicle and politely asked if they wanted some

candy. They first said yes but then changed their mind and informed him they did not want any candy.

20. Thinking he might have startled the two girls, Mr. Sharp apologized and informed them that he was a "former cop." He also showed them that he had a security badge and a security guard license to let them know who he was and to reassure them that he was not a threat. The two girls politely declined the offer of candy and Mr. Sharp continued on down the road to campaign with his neighbors. At no point did the children approach Mr. Sharp, and Sharp never exited his vehicle.

21. As Mr. Sharp continued down his street, he noticed another group of three adults and three children. He once again stopped and asked the parents if the children would like some candy, and confirmed that it was OK with their parents. He also held up his campaign sign for First District Constable and said that he hoped he could count on their vote in November. Sharp then proceeded to the circle the block, but did not notice anyone else walking in his neighborhood and returned to his home.

22. Later that evening, between 8:00pm and 10:00pm, Mr. Sharp was sitting on his back porch with his wife when his dogs began barking. He noticed a BGPD police car sitting in the middle of his road with his running lights turned on outside of Sharp's home. In order to identify himself, Mr. Sharp went inside, grabbed his driver's license, his private protective security license and security badge, which he kept in the same location. He then approached the patrol car, but the officer was on the phone. Sharp waited for the officer to conclude his phone call and then spoke with him.

23. The BGPD officer was Stephen Irvin. After Mr. Sharp introduced himself, another BGPD officer arrived on scene. When speaking with the officers, Mr. Sharp never said he was with the Metro Nashville Police Department or that he had worked for the Metro Police Department.

24. Officer Irvin asked Mr. Sharp about the candy he had passed out, and Sharp informed him that he had done some campaigning for the upcoming November 7, 2022 election for District One Constable.

25. Mr. Sharp and his wife both stated to Officer Irvin that they routinely purchased Halloween candy early, and that they hand it out all the time to their neighbors during the season and had done so with neighborhood children the prior year. Having served as a Deputy Constable for District 6 in Warren County from 2010 to 2013, Mr. Sharp wanted to reinforce a positive public opinion of an elected law enforcement position by educating citizens about constables and seeking their support for his election. Handing out candy to the younger generations was merely one way that Sharp sought to improve the public image of law enforcement.

26. The BGPD concluded their visit, and Mr. Sharp and his wife returned to their home.

27. Mr. Sharp's wife informed him that the father of one of the girls had posted about the incident on Facebook. Mr. Sharp reached out to the girl's father, explained what had happened, and apologized for any fear or alarm he might have caused. Mr. Sharp explained that he has four children and understood his concerns. The father of the girl agreed, took down his social media post, and Mr. Sharp believed the issue was over.

**The Events of September 29, 2022.**

28. Mr. Sharp left Bowling Green on the morning of September 29, 2022 to work a traffic control job at the same location in Nashville, Tennessee the prior day. He arrived and clocked in by 8:00 am.

29. Sharp had oversight of the 4-way intersection and was assisted with the help of two flaggers, Justin Wood and Kristof Thompson. There were eight to ten workers and multiple pieces of heavy equipment working in an excessively loud, chaotic environment.

30. At 2:16pm WBKO published a statement from Bowling Green Police Department as follows: *BGPD has taken appropriate action to ensure this incident does not occur*

*anymore in the future,"* the post stated. *"We are glad this incident was not a true "Stranger Danger", but we want to use it as a teaching moment and reminder that children should be counseled to never approach vehicles or subjects offering something to them. Stay safe Bowling Green."*

31. At 2:22pm, Mr. Sharp received a phone call on his cell from a man identifying himself as Major Josh Hughes at the BGPD. Maj. Hughes said he had a couple of questions about the events of September 28th. Maj. Hughes asked if Sharp was in Bowling Green, and he replied that he was not and that he was working a security job in Tennessee. Maj. Hughes then stated that he knew Sharp from when he had worked a traffic control detail in Bowling Green, Kentucky for another contractor.

32. Mr. Sharp could barely hear Maj. Hughes during the phone call due to the loud equipment operating in his vicinity, but he did not want to discontinue the call and seem discourteous to Maj. Hughes. Hughes certainly would have heard that Mr. Sharp was in a loud environment and the loud ram hoe that was hammering and breaking up concrete in Mr. Sharp's background. Hughes would later falsely accuse Mr. Sharp of delaying his responses to create a false impression that Sharp was somehow being evasive, which Hughes knew or should have known was false.

33. Mr. Sharp was also answering questions from workers who were present at the worksite, and Hughes knew or should have known that Sharp was not responding "yes" to Hughes' questions at the time.

34. Mr. Sharp recalls Hughes asking him if he had a yellow traffic vest, and Sharp confirmed that he did. Sharp heard Hughes ask if he was an "officer" and Sharp understood Hughes as asking if he was a traffic control officer, given the events occurring during the call at the worksite. Sharp stated that he was. He is licensed as a private protective armed security *officer* with the State of Tennessee. Hughes then asked Sharp where he had been an officer and Mr. Sharp understood that Hughes was asking where he had been a police

officer. Sharp stated that he had been a reserve officer and then a full-time officer at the City of Millersville, but that he had not worked there since January of 2022.

35. When asked whether he was currently a police officer, Sharp stated that he was not and that he had resigned from Millersville. Maj. Hughes said, "That's not what the Chief said." Mr. Sharp informed Hughes that the information Hughes had received from Dustin Carr was incorrect, and that Sharp had, in fact, resigned from Millersville. Dustin Carr therefore falsely claimed to Maj. Hughes that Sharp had been terminated when, in fact, he had resigned from the position.

36. Maj. Hughes then accused Mr. Sharp of previously stating that he worked for the Metro Nashville Police Department, and Sharp made it clear that he had never said he worked for the MNPD. Maj. Hughes then stated, "That's all I've got right now. I'll contact you if I have any additional questions." Maj. Hughes then terminated the phone call.

37. Mr. Sharp's traffic control shift ended at 3:00 pm. Thereafter, the Bowling Green Police Department posted the location of Mr. Sharp's harm on social media, which caused threats to be made against Mr. Sharp and his family. Mr. Sharp and his wife grew concerned for their safety, and Mr. Sharp was compelled to take down his social media pages and his election campaign page.

38. Later that evening on September 29, 2022, three BGPD officers arrived at Mr. Sharp's home and demanded entry. They did not have a warrant, but Mr. Sharp's wife was intimidated by them and allowed them into the residence, which they began searching. The officers seized Mr. Sharp's commemorative Millersville PD badge from the case where it had been placed. One officer said, "Wait, so he doesn't have it [the badge] on him?" Mrs. Sharp stated, "No, it stays here in the cabinet with the others." Mr. Sharp's commemorative badge had the letters "TN" instead of a badge number, distinguishing it from a duty badge. Sharp had ordered the badge back on October 6, 2021 with the permission of Millersville's Chief of Police at the time, Mark Palmer. Sharp purchased

the commemorative badge to place it in a shadowbox on a wall in his home. The BGPD officers did not take any of Mr. Sharp's other commemorative badges or patches that he had collected during his law enforcement career.

39. Thereafter, the BGPD took action to falsely arrest Mr. Sharp, prosecute Mr. Sharp, and continue a false prosecution in violation of Mr. Sharp's rights guaranteed by the United States Constitution.

40.

## CAUSES OF ACTION

### COUNT I – FALSE ARREST

41. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

42. Defendants acting under color of state law, falsely arrested Plaintiff without probable cause in violation of the Fourth Amendment.

43. As a direct and proximate result of Defendant's actions, Plaintiff suffered damages compensable at law.

44. Defendant's actions were willful, wanton, malicious, and done with reckless disregard for Plaintiff's rights.

### COUNT II – FALSE IMPRISONMENT

45. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

46. Defendants, acting under color of state law, unlawfully detained Plaintiff without legal justification, constituting false imprisonment.

47. Plaintiff was harmed as a direct result of this detention.

48. This conduct was a violation of Plaintiff's Fourth and Fourteenth Amendment rights.

### COUNT III – FALSE AFFIDAVIT OF COMPLAINT AND LYING UNDER OATH

49. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

50. Defendant knowingly and intentionally made false statements in an affidavit of complaint and lied under oath to initiate and maintain the prosecution of Plaintiff.

51. These actions were undertaken with malice and in reckless disregard of Plaintiff's rights.

52. As a result of these actions, Plaintiff suffered damages.

## COUNT IV - CONSPIRACY

53. The Defendants, acting under color of state law, unlawfully conspired and deprived Plaintiff of his constitutionally protected right to be free from unlawful search and seizure, which illegal actions were taken with forethought and knowledge that the commission of such deprivations were illegal, and which illegal actions were therefore made knowingly and with intent to deny the Plaintiffs of their rights secured by the U.S. Constitution.

54. In furtherance of their conspiracy to deprive the Plaintiff of his constitutional rights, the Defendants have committed overt acts, including unlawfully targeting Plaintiff for investigation, arrest, and prosecution.

55. The Defendants, each of them acting in concert, conspired and agreed to deprive Plaintiff of his constitutionally protected rights, guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## RELATED STATE LAW CLAIMS

56. Plaintiff realleges and incorporates by reference all foregoing paragraphs, and by virtue of the foregoing allegations, the Defendants have committed violations of Kentucky state law as alleged herein for all supplemental state law claims available under law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prayers for judgment as follows:

1. That process be issued and the Defendants to answer within the time required by law;

2. That the Court upon final hearing declare and find that the actions and policy of the Defendants have violated Plaintiff's right to be free from unlawful search and seizure, which right is guaranteed by the Fourth Amendment to the U.S. Constitution;

3. That the Court upon final hearing declare that the Defendants are liable for malicious prosecution, abuse of process, false imprisonment, and false arrest under 42 U.S.C. § 1983 and related law under the laws of the State of Kentuckyh;

4. That the Court issue a permanent injunction enjoining the Defendants from further deprivation of the constitutional rights of the Plaintiffs;

5. The Plaintiff be awarded such damages as will fully compensate Plaintiff for all injury caused by the Defendants' actions and failure to act as alleged herein;

6. That Plaintiff be awarded attorney's fees, expenses, and costs as authorized under 42 USC § 1988;

7. As to the Defendants acting in their individual capacities, Plaintiff demands judgment and an award of punitive damages against them in an amount to be determined at trial;

8. That Plaintiff be awarded such additional and general relief to which he may be entitled, at law or in equity;

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

_____
Robert Sharp
7704 Morgantown Road
Bowling Green, Kentucky 42101
bnalnc@aolcom

*Plaintiff, Pro Se.*